**WATER TECHNOLOGIES CORPORA-TION, Water Pollution Control Systems, Inc., Kansas State University Research Foundation, Aqua-Chem, Inc., Plaintiffs,**

v.

**CALCO, LTD. and William J. Gartner, Defendants.**

No. 82 C 4330.

United States District Court, N.D. Illinois, E.D.

Oct. 22, 1986.

See also 576 F.Supp. 767.

Michael R. Dinnin, Robert A. Dunn, Harness, Dickey & Pierce, Birmingham, Mich.,

Wm. A. VanSanten, Chicago, Ill., for plaintiffs.

Robert E. Wagner, Daniel N. Christus, Wallenstein, Wagner, Hattis, Strampel & Aubel, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McGARR, District Judge.

1. This action arises under the patent laws, Title 35 U.S.Code. Jurisdiction and venue are based on 28 U.S.Code, particularly, 28 U.S.C. §§ 1338 and 1400(b). Venue and jurisdiction are proper.

2. The United States patents involved in this civil action are (PTX-1 to 4):

| Patent No. | Title | Inventor(s) | Issue Date |
|---|---|---|---|
| 4,187,183 (" '183") | Mixed Form Polyhalide Resins for Disinfecting Water | Gary L. Hatch | Feb. 5, 1980 |
| 4,190,529 (" '529") | Mixed Form Polyhalide Resins for Disinfecting Water | Gary L. Hatch | Feb. 26, 1980 |
| 3,817,860 (" '860") | Method of Disinfecting Water and Demand Bactericide for Use Therein | Jack L. Lambert Louis R. Fina | June 18, 1974 |
| 3,923,665 (" '665") | Demand Bactericide For Disinfecting Water and Process of Preparation | Jack L. Lambert Louis R. Fina | Dec. 2, 1975 |

3. These patents deal with bactericidal resin products (called demand bactericide resins) which relate to the disinfecting of water. The resins are also often referred to as triiodide resins (I–₃) or as triiodide mixed with certain amounts of pentaiodide (I—$_{x}$5).

4. The defendants' products accused of infringement are resin containing products called Pocket Purifier straws. The Calco Pocket Purifier is referred to as a straw purifier product because, when used, it is inserted into water and the user sucks the water up through it like a straw. These products are sold through sporting goods stores.

*Factual Background*

5. Plaintiff Water Technologies Corporation (hereinafter "WTC") is a Delaware corporation, having a principal office at Ann Arbor, Michigan.

6. Plaintiff Water Pollution Control Systems, Inc. (hereinafter "WPCS") is a Texas corporation also having an office at Ann Arbor, Michigan, and it is a wholly owned subsidiary of WTC. Mr. L.L. Davis, one of the witnesses, is president of WPCS and also WTC.

7. Aqua-Chem, Inc. is a Delaware corporation having its principal offices at Milwaukee, Wisconsin. The two Aqua-Chem/Hatch patents involved in this litigation were assigned to Kansas State University Research Foundation as of an effective date of December 31, 1984.

8. Kansas State University Research Foundation (hereinafter "KSURF"), is a non-profit corporation of Kansas, and KSURF has its principal offices at Kansas State University, Manhattan, Kansas.

9. Defendant Calco, Ltd. (hereinafter "Calco") is an Illinois corporation having its principal place of business at Rosemont, Illinois.

10. Defendant William J. Gartner (hereinafter "Gartner") is an Illinois resident who resides in Bartlett, Illinois.

11. The demand bactericide resins and methods disclosed in the '860 and '665 patent inventions were developed by chemistry Professor Jack L. Lambert and microbiology Professor Louis R. Fina at Kansas State University in the late 1960's. The '183 and '529 patent inventions were improvements developed in 1974–75 by Dr. Gary L. Hatch of Aqua-Chem (who, prior to his employment at Aqua-Chem, had received his Ph.D. degree in chemistry at KSU).

12. In 1973, KSURF granted an exclusive license to Aqua-Chem under the '860 and '665 patents. Aqua-Chem subsequently granted an exclusive sublicense under all four patents for the defined field of products containing less than 100 cubic centimeters ("cc") of the resins, in September, 1977, to WPCS. WPCS later became a wholly owned subsidiary of Water Tech ("WTC"), whereas, in September, 1977, it was wholly owned by Walbro Corporation of Cass City, Michigan.

13. In 1981–82, when the activities of the defendants first became known to plaintiffs, WTC approached their licensor Aqua-Chem with a request that Aqua-Chem take necessary measures to stop the accused activities. In that Aqua-Chem declined to take measures to prevent it, WTC–WPCS withheld further royalties to Aqua-Chem and filed this civil action as exclusive licensee under the patents in early July, 1982, naming Aqua-Chem as an involuntary plaintiff and cross-defendant. Thereafter, in September of 1982, Aqua-Chem terminated the exclusive license to WPCS, *i.e.*, a few months after the civil action was filed, and claimed the royalties unpaid under the agreement.

14. The cross claims formerly involved herein between Aqua-Chem and WTC/WPCS were settled by an agreement signed in May, 1985. The Aqua-Chem settlement agreement also terminated the former 1973 exclusive license from KSURF to Aqua-Chem, and, pursuant to the agreement, the two Aqua-Chem/Hatch patents '183 and '529 were assigned to KSURF (along with all rights for past infringements). Thus, as of the time of trial, KSURF was and is the owner of all four patents involved in this lawsuit, and KSURF gave notice to all parties that it had changed its capacity to voluntary plaintiff on or about May 30, 1985.

15. Aqua-Chem was dismissed from the lawsuit on the first day of trial, as a result of the settlement (order dated on or about June 14, 1985). Co-defendant Robert Kalnitz was also dismissed from the action by order of the court on or about June 21, 1985.

16. In this civil action, the defendants Gartner and Calco are charged with patent infringement and unfair competition, 28 U.S.C. § 1338.

17. KSURF, as owner of the four patents, is suing the defendants Calco and Gartner for infringement damages, and an injunction. WTC/WPCS is suing the defendants for infringement damages caused to it as exclusive licensee under all four patents prior to their license termination date of September, 1982, and for unfair competition.

18. The infringements are claimed to be in violation of 35 U.S.C. § 271(a) and § 271(b), which include direct infringement and active inducement of infringement.

19. The plaintiffs have charged defendants Calco and Gartner with infringement of the patents in suit by reason of the manufacture, use, and sale by the defendants of a straw purifier product, the Pocket Purifier, utilizing the patented resins and methods.

20. In late 1979 and early 1980, defendant Gartner did not know how to make the triiodide resins. He therefore made some contacts with the people at Aqua-Chem on the basis that he was doing some consulting work for Brunswick Corporation, a company not involved in this litigation, and that Brunswick would probably take a license for larger sized resin products. After one of Gartner's early telephone conversations (July 24, 1980) with Aqua-Chem, Gartner noted in his memo that "Mandy will tell me how to make it." "Mandy" was Armando Steinbruchel, president of Aqua-Chem.

21. Gartner knew at this time that the Aqua-Chem resins were exclusively licensed to WPCS for products of 100 cc or less size, that WPCS had a right of first refusal on any other licenses; and that Gartner himself had been refused a license. Nonetheless, he took the Aqua-Chem resin formula to Calco and licensed Calco (on September 24, 1980), to manufacture, use and sell the resin in the straw purifier product. He indicated to Calco that the formula was confidential. He also gave Calco an identification of the specific ingredients used by Aqua-Chem to make the resin. Gartner and Calco carried out these activities without advising Aqua-Chem or WPCS.

22. Prior to the time of the accused activities by defendants, the plaintiff WPCS had been operating since 1977 under its exclusive license from Aqua-Chem to manufacture and sell water purifiers (usually referred to as Walbro Water Purifiers or Water Tech Water Purifiers).

23. In 1979, the defendant Gartner (who is a chemist and runs one or two different chemical labs) entered into a consulting agreement with Brunswick Corporation. That consulting arrangement was ostensibly for the purpose of helping Brunswick to develop new products for sale in the water purification field. In connection with this consulting work, Brunswick put the defendant Gartner in touch with Aqua-Chem's personnel.

24. Later in August of 1979, through the auspices of Brunswick and Aqua-Chem, Gartner arranged for and held a meeting with the personnel of WTC/WPCS at their offices in Ann Arbor, Michigan.

25. During the August, 1979 meeting, WTC did not give Gartner any samples of the resin, nor did they give him any formulas or recipes to prepare the resin. However, WTC did give Gartner technical literature on their own water purifier products which utilized the patented triiodide resin.

26. Approximately 11 months after Gartner's visit to WTC in Ann Arbor, he filed his own patent application in July of 1980 to cover a water purifier device of the straw type. He claimed the device as being his own development. The device used a first section of the resin and another section of activated carbon, very similar to one of the devised he had learned about at WPCS.

27. In late July or August of 1980, defendant Gartner had further contacts with Aqua-Chem's employees Mandy Steinbruchel and Richard Geiger. In these discussions, Gartner learned the history of the resin developed at Kansas State University in the triiodide resin form, and he also learned that Aqua-Chem had discovered a new way to make the resins, and that Aqua-Chem had obtained patents on their product and method as well. Gartner then convinced Aqua-Chem to tell him how to make Aqua-Chem's preferred resin formula, on the basis that Gartner would assist Aqua-Chem in licensing the patents to Brunswick for products larger than 100 cc size.

28. As of September, 1980, both defendants Gartner and Calco were aware of the four patents involved in this action. They made no searches or investigations relative to the four patents.

29. A month or so after Gartner and Calco entered into their license agreement to manufacture and sell the Pocket Purifier straws, Calco manufactured their first batch of the Aqua-Chem triiodide resin on November 4, 1980, using a formula which was identical to the preferred formula and stoichiometric ratio of ingredients which had been given by Aqua-Chem to Gartner on August 28, 1980. This preferred formula is also described in Table I of the Aqua-Chem/Hatch '183 and '529 patents, which were granted as improvements on the two basic KSURF patents '860 and '665.

30. In approximately May of 1981, Gartner advised Aqua-Chem that the proposed business dealings with Brunswick had fallen through. He did not advise Aqua-Chem that he and the other defendant Calco were already using and selling the accused straw purifier products.

31. Subsequently in the early Fall of 1981, WTC/WPCS learned of the defendants' product because WTC was on the verge of concluding an agreement with one of the large U.S. national corporations to market and sell the WTC patented product. This agreement collapsed when the national corporation learned of defendants' product, thus believing that WTC's product was no longer a patented proprietary property.

32. This led the personnel at WTC/WPCS, KSURF and Aqua-Chem to make an investigation of the defendants' activities, and this civil action was then filed in July, 1982.

33. Defendants argued at trial that the Calco resin batch manufactured on November 4, 1980 was never used and sold in Pocket Purifier straws, but the evidence does not support this contention. The Calco batch sheet itself states on its second page, signed by Mr. Gartner, that it is the resin for the Pocket Purifier. As testified by Dr. Short, the batch contained enough resin to manufacture well over 3,000 units. Defendants claimed that most of this resin

batch had been used to fill some canisters to be tested for Brunswick, but there were no documents to support such a claim. The documents of that time period all point to usage of the resin in Pocket Purifiers.

34. Defendants' witnesses all testified that correspondence concerning their Pocket Purifier which they had sent to the EPA was truthful. In answer to a specific question from the EPA as to how the resin for the Pocket Purifier was made, the defendants answered that it was by the November 4, 1980 batch sheet. Their letter to the EPA on March 19, 1981 attaches a copy of the November 4, 1980 batch sheet as its Exhibit C.

35. Calco's sales invoices, particularly for the early months of 1981, show that there were numerous sales of the Pocket Purifier straws. In that defendants' witnesses had testified that all of their batch sheets had been produced to plaintiffs, there was no other resin available from which to manufacture the Pocket Purifier straw in late 1980 and early 1981. Further, Mr. Gartner did not provide the "Gartner modified resin formula" (prepared as shown in his '590 patent Example 1) to Calco until February 23, 1981 at the earliest. Gartner also testified that, as of March 19, 1981, the November 4, 1980 batch was the only one made. Even usage of February 23, 1981 as the cut-off date establishes that manufacture, use, and sales of the accused infringing products made from the November 4, 1980 resin batch took place.

36. Calco's president, Mr. Kalnitz, admitted at trial that at least 400 to 500 Pocket Purifier straws were sold using the November 4, 1980 batch resin. As stated by the Federal Circuit, *Roche Products v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 861 (Fed.Cir.1984):

> It is beyond argument that performance of only one of the three enumerated activities is patent infringement. It is well-established, in particular, that the use of a patented invention, without either manufacture or sale, is actionable.

37. The defendant Gartner's modified resin formula was not actually prepared until some time in the first half of 1981. Mr. Gartner developed his modified formula by adding a small amount of potassium bromide to the Aqua-Chem resin formula which was used in the November 4, 1980 Calco batch sheet.

38. The weight of the evidence shows that, from the beginning, Gartner decided to add the small amount of potassium bromide, because he thought this might make it "... possible to skirt both the KSU and Aqua-Chem patents." He had no way of knowing at that time whether or not adding the small amount of bromide would have any effect on the elutable iodine coming from the resin, nor did he have any way of knowing whether it would affect the bactericidal abilities of the finished resin.

39. On April 6, 1981, Gartner filed a patent application on his resin, and the resin as modified was used in the Calco Pocket Purifier straws. As noted during the trial, the preparation of his resin is described in Gartner '590 patent Example 1. The exact beginning date of such usage in the Pocket Purifier is not known, but it could not have been before February 23, 1981, because that is the earliest entry of the resin formula in the Calco batch records. The evidence indicates such usage did not occur until at least several months later because the resin was not even tested for bactericidal ability until April 28, 1981.

*The Issue of Elutable Iodine at Trial*

40. Gartner admitted in his testimony at trial that he had never analyzed his finished resin to determine how much of the bromine stayed in the resin product. Accordingly, so-called "improved characteristics," which the defendants seek to attribute to Gartner's prepared resin are unsupported by the evidence. Moreover, the defendants' expert, Dr. Adams, admitted that the bromine would not have any effect on the performance of the Gartner resin.

41. On the issue of elution of iodine from the Gartner patent resin, Dr. Adams indicated he had found none by his tests. However, Dr. Adams stated that his test for elutable iodine had a sensitivity of less than 100 parts per million. Thus, the sensi-

tivity of his measurement was not sufficient to determine a halogen free or iodine free wash water. For example, the water disinfecting resins in the KSURF patents are measured for elutable iodine in the range from about 0.2 ppm to about 7 or 8 ppm, with 5 pppm being a large amount of elutable iodine.[1]

42. The other experts at the trial also uniformly testified and confirmed that the small amount of bromine in the Gartner resin (approximately 0.5% wgt.) would have a trivial and insignificant effect on the resin properties. Dr. Fina's testimony also confirmed that the small amount of potassium bromide added would have no effect on the bactericidal properties of the Gartner resin.

43. Dr. Lambert also demonstrated by tests in the courtroom that the resin in the Pocket Purifier eluted a significant amount of elutable iodine. His tests were done in front of the attorneys and experts for both sides. His courtroom tests showed that there was approximately 5 to 7 ppm elutable iodine from the resin of the Pocket Purifier.

*Patent Validity*

■ 44. Under U.S. law, a presumption of validity is attached to the four patents in suit. 35 U.S.C. § 282. The patents should be presumed valid unless the presumption can be overcome by more than a dubious preponderance of the evidence. *Jones v. Hardy,* 727 F.2d 1524, 220 U.S.P.Q. 1021, 1024–25 (Fed.Cir.1984); *Hughes Aircraft Co. v. U.S.,* 717 F.2d 1351, 1359 (Fed.Cir. 1983).

45. The defendants' position at trial that the inventions were obvious, raises the question of patentability under 35 U.S.C. § 103. Under § 103 and the tests of *Graham v. John Deere & Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966), the scope and content of the prior art should be determined; the differences between the prior art and the claims at issue should be ascertained; and the level of ordinary skill in the pertinent art resolved.

46. The scope and content of the prior art were primarily shown by the Dow Chemical Co./Mills patent 3,462,363. This was the main reference used at trial by the defendants and their expert witness Dr. Adams to argue for the invalidity of the two Lambert/Fina '860 and '665 patents. Defendants also took the position that the two Aqua-Chem/Hatch improvement patents '183 and '529 were invalid over the Lambert-Fina '860 patent.

47. The level of ordinary skill in the pertinent art of water disinfecting resins was exemplified by the defendant Gartner, who stated at trial that he considered himself to be of ordinary skill in the art. No other evidence on level of skill was offered by defendants.

48. The difference between the prior art and the claims at issue was exemplified by the differences over the Mills '363 patent. Those differences are essentially that Mills does not teach a "demand bactericide" resin, and that Mills requires a "tandem system," *i.e.,* a second "Scavenger Resin" column in tandem to remove the eluent (*e.g.,* bromine) from his first resin column which is purposely made so that the anions will easily release into the water being treated so that the water can be disinfected.

■ 49. Other factors to be taken into account in determining the question of obviousness or non-obviousness of the inventions involve the secondary considerations, such as long felt but unsolved needs, failure of others, copying, adoption by competitors, tributes given to the invention, and these factors are all relevant to the determination on obviousness under 35 U.S.C. § 103. *Rosemount, Inc. v. Beckman Instruments Inc.,* 727 F.2d 1540, 221 U.S.P.Q. 1, 7 (Fed.Cir.1984); *Bott v. Four Star Corp.,* 218 U.S.P.Q. 358 (E.D.Mich.1983), *aff'd,* 732 F.2d 168 (Fed.Cir.1984).

*Long Felt Need*

50. For 20 to 30 years or longer prior to Lambert and Fina's development of the '860 and '665 patented inventions, various parties had used materials such as

---

**1.** The units of parts per million ("ppm") are the same as milligrams per liter (mg/L).

iodine or chlorine to disinfect water. For example, iodine tablets or chlorine were inserted directly into the water; however these prior techniques necessarily required that large residual amounts of the disinfectant remain in the water, which was very harmful to the taste, or harmful to the eyes and mucous membranes. Lambert and Fina were the first ever to develop a "demand bactericide resin" whereby the disinfectant resin generally releases iodine only upon being contacted with a bacteria or germ to be killed, and the treated water is still ready for immediate use or drinking thereafter. Defendant Gartner also agreed that the resin used in the Pocket Purifier was a demand bactericide resin. Testimony was given by the inventors, Dr. Lambert and Dr. Fina, on the nature of prior water purifying techniques, and what a demand bactericide resin is.

*Failure of Others*

■ 51. Defendant Gartner had been working in the area of water purification and water disinfecting in the 1970's, and he also considered himself to be a person of ordinary skill in the art. It is clear from the evidence that Mr. Gartner was not able to prepare or make a demand bactericide resin until after he secured the knowledge to do same directly from Aqua-Chem. The evidence shows that while Mr. Gartner had been attempting to work with the resins in the August-November, 1979 time period, he still could not figure out how to make the resins. This was shown by his later July 24, 1980 memorandum which stated "Mandy will tell me how to make it." "Mandy" was Armando Steinbruchel, president of Aqua-Chem. This evidence indicates nonobviousness.

*Tributes to the Inventions from Others*

52. As was testified to during the trial, both of the inventors Lambert and Fina received awards from NASA for their development of the triiodide demand resin which was used on the first space shuttle flight "Columbia" in April, 1981. Their employer Kansas State University also received a similar award.

53. Also in connection with the triiodide resin water disinfecting system described in the Lambert-Fina '860 and '665 patents, Dr. Fina was invited to New Delhi, India in 1975 to present a technical discussion and paper on their development at the second World Congress on water.

54. The co-defendant Gartner paid several tributes to the patented resins in his own correspondence well before the lawsuit was filed. Defendant Gartner (as head of Aqualab, Inc.) stated in a letter dated October 16, 1980 to Brunswick, discussing the KSU/Aqua-Chem patents in suit:

> At this point in time, I still firmly believe in the huge market potential of tri-iodide. It is also my opinion that they would settle for a license agreement with lower fees if they want the iodine/iodide residual removal system.

*Copying*

■ 55. The evidence demonstrates that the first Pocket Purifier straws manufactured and sold by the defendants were made at Calco from the November 4, 1980 batch sheet formula given to them by Mr. Gartner. This formula was precisely the same as the Aqua-Chem patents resin formula which Mr. Gartner had obtained from Aqua-Chem in late August, 1980, on the basis that he was going to use it for his consulting work with Brunswick. Defendants Calco and Gartner could have attempted to use some other type of base resin to carry the iodide, however, even on this point they copied the Ionac ASB-1 ingredient given to them with the Aqua-Chem formula, which is a quaternary ammonium anion exchange resin covered in all four of the patents in suit. Defendants had access to the inventions and knowledge of the patents prior to manufacturing their first resin containing products on November 4, 1980. Copying of the patented inventions is strong evidence of non-obviousness of the patents in suit. *Milgo Electronic v. United Business Communications*, 623 F.2d 645, 656 (10th Cir.1980), *cert. den.*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). *See also, Panduit Corp v. Dennison Mfg. Co.*, 774 F.2d 1082, 227 U.S.P.Q. 337, 349 (Fed.Cir.1985).

*The Prior Art*

56. Defendants' main challenge to the patents in suit was as follows: (1) That the Lambert-Fina '860 and '665 patents are invalid over the earlier Mills '363 patent; and (2) that Aqua-Chem/Hatch '183 and '529 improvement patents are invalid over the Lambert-Fina '860 patent.

57. Lambert and Fina were the first to develop a demand type bactericide resin which is not disclosed in Mills. When they first presented their development to others, people thought it wouldn't work. Defendants' expert Dr. Adams agreed that there was no mention of a demand bactericide resin in the Mills patent.

■ 58. The Mills patent 3,462,363 has no bearing on the Lambert-Fina patents because Mills requires two different resins in a "tandem resin system" The first resin being polyhalogenated so that it quickly releases a lot of halogen (bromine) into the treated water, which then passes through a second resin system to scavenge the high levels of halogen given off by the first resin. In the evidence at trial, even Gartner admitted that the Mills patent had "no bearing" on the triiodide resin system disclosed in the KSU patents. This evidence from Gartner (a person of ordinary skill) also shows that the '860 and '665 inventions were plainly non-obvious and not taught from the disclosure in the Mills patent.

59. In the Mills patent description of suitable polyhalide anions that Mills suggests to be used, numerous different polyhalides such as $Br_3^-$, $Br_5^-$, etc., are mentioned. But there is no mention of triiodide.

60. Column 4 of the Mills patent (at lines 16–18) contains a negative teaching which would lead one directly away from the triiodide-type resin. This portion of Column 4 states that the effective anions are those which have a good equilibrium dissociation (*i.e.*, will release easily into the water), whereas the equilibrium dissociations of the iodides were low, thus teaching that the iodides should not be used. Not a single one of the example formulations in Mills use a triiodide; all of them use some

type of polybromine which are unstable and quickly dissociate into the treated water.

61. The personnel at Dow congratulated Lambert and Fina on their invention, thus indicating that Dow's Mills patent was clearly not the same. Defendants' expert at the trial, Dr. Adams, testified that Mills' broad general formula would suggest to one skilled in the art that a triiodide resin be used. However, Dr. Adams admitted that the term triiodide did not appear in the Mills Column 1 description of what polyhalide anions may be used.

62. The defendants in their pretrial brief (filed June 13, 1985) asserted that the Hatch '183 and '529 improvement patents were invalid due to the earlier Lambert-Fina patent for obviousness or anticipation.

63. The co-defendant Gartner had been aware of the '860 patent since 1977, and yet in 1979 and early 1980, he still could not figure out how to prepare the Aqua-Chem resin. The '860 patent did not teach, suggest, or render obvious to Mr. Gartner, one of ordinary skill in the art, how to make the Aqua-Chem triiodide resin.

64. Defendants' expert Dr. Adams gave no testimony or evidence at trial that the Aqua-Chem '183 and '529 improvement patents were invalid. On the other hand, plaintiffs' experts Dr. Lambert, Dr. Fina, and Dr. Short all testified and explained that the '183 and '529 improvement patents were valid.

65. During the patent application prosecution of the Lambert-Fina '860 and '665 patents, the Mills '363 patent was cited and considered by the Patent Office Examiner and the '860 and '665 patents were both allowed thereover.

66. Similarly, during the patent application prosecution of the Hatch '183 and '529 patents, both the Lambert-Fina '860 and Mills '363 patents were cited and considered by the Examiner prior to his allowance of the '183 and '529 patents.

■ 67. Prior art cited in the patent application prosecution should be accorded little significance, since it is presumed to be

**972**

patentably distinguished over by the claims issued by the Patent Office. *Anderson Co. v. Sears, Roebuck & Co.*, 265 F.2d 755, 761 (7th Cir.1959).

68. Prior art no better than, or not significantly different from, that cited in the Patent Office does not overcome the presumption of validity under 35 U.S.C. § 282, and in fact strengthens the presumption of validity. *Laser Alignment, Inc. v. Woodruff & Sons, Inc.*, 491 F.2d 866, 871 (7th Cir.1974), *cert. den.*, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Crane Co. v. Aeroquip Corp.*, 364 F.Supp. 547, 555 (N.D.Ill.1973), *modified (aff'd)*, 504 F.2d 1086, 1088–89 (7th Cir.1974); *Skil Corp. v. Cutler-Hammer, Inc.*, 412 F.2d 821, 162 U.S.P.Q. 132 (7th Cir.1969).

69. The defendants have a heavy presumption against them in arguing that the patents and claims do not comply with 35 U.S.C. § 112, where the Examiner reviewed the adequacy of the descriptions and found the patent descriptions to be definite and allowed the patents thereafter. *Briggs v. M & J Diesel Locomotive Filter Corp.*, 228 F.Supp. 26, 46–48, 141 U.S.P.Q. 96, 112–114 (N.D.Ill.1964), *aff'd*, 342 F.2d 573, 578–579, 144 U.S.P.Q. 701 (7th Cir. 1965), *cert. den.*, 382 U.S. 801, 86 S.Ct. 11, 15 L.Ed.2d 55. Defendants' expert, Dr. Adams, gave no testimony that the patents were indefinite. The evidence indicates that the patents are definite in compliance with the statute.

70. The defendants have the burden of proving what is a person of ordinary skill in the art. The court must have some factual basis in the record evidence from which it can determine what the person of ordinary skill in the art would find to be obvious (35 U.S.C. § 103), and it has been recognized to be the burden of the alleged infringer who asserts the affirmative defense to demonstrate to the court this level of skill. *Bott v. Four Star Corp.*, 218 U.S.P.Q. 358, 370 (E.D.Mich.1983), *aff'd*, 732 F.2d 168 (Fed.Cir.1984); *Saginaw Products v. Eastern Airlines, Inc.*, 195 U.S.P.Q. 551, 555 (E.D.Mich.1977), *aff'd*, 615 F.2d 1136, 1140 (6th Cir.1980).

71. The defendants have not met their burden. Lack of evidence alone in this connection would be sufficient to hold that defendants have not met their burden of proof of obviousness of the patents in suit under the *Graham v. Deere* tests. *Saginaw Products, supra* at 558–559; *Shaw v. E.B. & A.C. Whiting Co.*, 417 F.2d 1097, 1104–1105 (2d Cir.1969), *cert. den.*, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970), *Bergstrom v. Sears, Roebuck & Co.*, 496 F.Supp. 476, 486–487 (D.Minn.1980). Neither defendants nor their expert Dr. Adams offered proof as to who was a person of ordinary skill in the art.

72. The defense of anticipation, which speaks to the novelty of an invention, derives principally from 35 U.S.C. § 102(a), which provides:

A person shall be entitled to a patent unless—(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant.

There can be no anticipation under 35 U.S.C. § 102(a) unless all of the same elements are found in exactly the same situation and united in the same way to perform identical functions in a *single* prior art reference. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760 (Fed.Cir.1983); *SSIH Equipment, S.A. v. Int'l. Trade Comm.*, 718 F.2d 365 (Fed.Cir.1983). There is no anticipation of the Lambert-Fina '860 and '665 patents by the alleged Mills '363 patent; nor is there any anticipation of the Hatch '183 and '529 patents by the earlier granted '860 patent.

*Patent Infringement*

73. In an earlier stage of this litigation, cross claims between WPCS and Aqua-Chem on their 1977 license contract were in issue, and Aqua-Chem was claiming payments under the contract. Water Technologies defended with the assertion that the patents involved in the license were invalid. This matter was settled between the parties and, on the eve of trial, Aqua-Chem was dropped from the case.

It is the contention of defendant Calco that the earlier pleadings in the Aqua-Chem/WPCS dispute in which WPCS alleged the invalidity of the patents licensed to it by Aqua-Chem and, in addition, in answers to interrogatories propounded by Aqua-Chem, asserted the invalidity of patents '183 and '529, interrogatory answers which were never later supplemented or changed, that defendants thereby enjoy the benefit of an admission by plaintiffs of the invalidity of the patents which plaintiffs are suing to enforce.

■■■ It is the view of the court that defendants were not party in any way to the original dispute between WPCS and Aqua-Chem and that, therefore, defendants in this case cannot take advantage of pleadings or interrogatories between those parties. The Aqua-Chem/WPCS controversy, having been settled before the instant trial, those pleadings or answers to interrogatories are no longer an essential or relevant part of the case now before the court.

Stated another way, the question is not whether the plaintiffs may assert inconsistent alternative theories vis-a-vis the same defendant, though they can, but whether the plaintiffs may assert alternative theories and legal positions vis-a-vis two entirely different and unconnected parties, in litigation wherein only one of those parties is involved in the ultimate disposition of the matter by the court.

While there is some appeal to the argument of defendant that the same counsel cannot be heard to solemnly assure the court of the validity of the patents in one breath and the invalidity in the next, it is also a common tactic to assert patent invalidity as a defense to a royalty claim and, until this defense has been adjudicated, it cannot be deemed to be the ultimate disposition of the validity issue in another context.

■■■ 74. Calco and Gartner were aware of the '860, '665, '183, and '529 patents before they started manufacture and sale of the accused resin products from the November 4, 1980 batch. While defendants argued that no sales of this batch had occurred, the weight of the evidence at trial showed otherwise. The Calco sales invoices and the testimony of Calco's president, Mr. Kalnitz, demonstrated a minimum of 400–500 units were sold prior to Calco's starting any new work with the Gartner modified resin on February 23, 1981. Under the law, even a single sale or use can constitute an infringement. "Deller's Walker On Patents," 2nd edit. (1972), Vol. 7, § 508; *Roche v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 861 (Fed.Cir.1984).

■■■ 75. Each batch of resin for the Pocket Purifiers made by Calco was used in a method of disinfecting water containing bacteria, and this was demonstrated by the reports attached to the various Calco batch sheets which show that part of every batch was taken to Mr. Gartner's laboratory (Aqualab, Inc.), where water containing bacteria was passed through the sample Pocket Purifier to confirm its ability to kill the bacteria and disinfect the water. Also, plaintiffs' Exhibit 76 and Attachments A through G therewith demonstrate the testing of Pocket Purifiers using the November 4, 1980 batch resin. Such uses, even for testing to obtain EPA approval so that the product can be sold, can constitute infringement. *Roche, supra,* p. 861. Both Calco and Mr. Gartner stated that the Pocket Purifier straws were to be used by their purchasers (according to the instruction on the package) by drawing water up through the straw and resin, using mouth suction, for the intended purpose of disinfecting the water.

■■■ 76. The accused infringements occurred in numerous different ways by both Calco and Gartner. For example, Gartner had on numerous occasions used the resins in Pocket Purifiers to test for bacterial kill. Gartner has also actively induced infringement at Calco by giving all of the resin formulas to Calco that were used by them to manufacture and sell the resins and Pocket Purifiers containing same. Calco participated in the manufacture, use and sale of the resins and Pocket Purifiers. Both Calco and Gartner actively induced the end purchasers of the Pocket Purifiers to infringe the patents (under § 271(b)) by

causing same to be sold with method of use instructions that infringe the patents. Gartner himself has also sold the Pocket Purifiers.

*Literal Infringement*

■ 77. As explained in the testimony of plaintiffs' experts Dr. Frank Short and Dr. Jack Lambert, there is literal infringement of the claims of the '183, 529, '860 and '665 patents. This literal infringement encompasses the resins manufactured, used, and sold by Calco and Gartner from their November 4, 1980 resin batch, and then all the subsequent batches from the Gartner resin which contains 0.5% by weight of bromine. Defendants' expert Dr. Adams did little to contradict that the patent claims read directly on the accused products. For the most part, his testimony was concentrated on the hindsight view (more than ten years after the fact) that the Lambert-Fina '860 patent was invalid over Mills '363. He espoused that view even though the patent examiner had carefully considered the Mills patent and defendant Gartner himself had said that Mills had "no bearing" on the KSU and Aqua-Chem patents.

■ 78. The November 4, 1980 Calco resin batch utilizes the base resin Ionac ASB–1, which is a quaternary ammonium anion exchange resin. As testified to by Dr. Short, the resin to $I_2$ to KI ratio is 1 to 1.0 to 0.8, which is one of the preferred ratios set forth in the Hatch '183 and '529 patents; and that the resulting mixed polyhalide bactericidal resin has values of a = 0.6 and b = 0.2, as referred to in the claims. The words of claims 1, 2 and 3 of Hatch '183 patent, and claims 1, 2, 3 and 6 of the Hatch '529 patent are directly readable on this resin and the method of disinfecting water using said resin.

■ 79. Dr. Lambert testified that the construction of the Pocket Purifier includes a bed of porous granular material, the lower portion of which is essentially a triiodide strong based resin and the upper granular material is activated charcoal, which removes any amounts of eluted iodine from the resin. The words of method claims 4

and 5 from the '860 patent are readable on the November 4, 1980 batch resin in a Pocket Purifier to disinfect water. Such method usage was carried out.

*The Gartner Resin With Potassium Bromide Added to It*

80. It is a central aspect of defendants' position that the presence of bromine in the Gartner formulation takes it outside the patents in issue. Defendants' expert Dr. Adams agreed that addition of the potassium bromide in Gartner's resin would have no effect whatsoever on the performance of the resin. The amount of bromine which actually stayed in the Gartner resin was only about 0.5% by weight. Plaintiffs' experts Dr. Short, Dr. Lambert, and Dr. Fina, also agreed that the small amount of potassium bromide would have a trivial and insignificant effect.

Dr. Adams indicated that he found no elutable iodine from the Gartner resin, however, this was because his test techniques were primarily qualitative (not quantitative), and the sensitivity of his test for elutable iodine was no better than 100 ppm.

81. The resins in question in this lawsuit are measured for elutable iodine in the range of about 0 to 7 or 8 ppm (*i.e.*, same as mg./L), and it is clear that Dr. Adams' tests were not sufficient to determine presence or absence of elutable iodine. At the same time, it was demonstrated by the courtroom tests of Dr. Lambert that the Gartner resin does have a positive showing of elutable iodine on the Cadmium iodide starch reagent test, particularly when the activated charcoal is bypassed, because, as discussed during the trial, when the eluted iodine from the resin is passed through activated charcoal, then the charcoal itself will absorb the eluted iodine.

82. In *Air Products v. Chas. S. Tanner Co.*, 219 U.S.P.Q. 223, 249 (D.C.S.C.1983), the patent dealt with chemical adhesive composition and it was held valid and infringed. The *Air Products* case states at page 249:

The defendants' argument focuses on the *"consisting essentially of"* language used in the introductory portion of claim 1. As discussed above, *this expression* precludes a finding of literal infringement only where a product contains additional, unrecited ingredients which, in nature and amount, change the basic and novel adhesive characteristics of the product. The Court finds, as the earlier discussion has shown, that the adhesive products made by defendants (E–200, E–216, E–220, and # –230), are basically and fundamentally the same as the product of claim 1. Consequently, the presence of the third monomers does not take the products outside the scope of the claims. (emphasis added)

Also, similar to the *Air Products* case, it appears that the only reason the defendants Calco, et al. added the small additional amount of potassium bromide in this case at bar was to provide a non-infringement argument. *See Air Products*, 219 U.S.P.Q. at p. 249:

Indeed, the reason they were added to defendants' products in the first place was to provide this non-infringement argument.

*See also, Ortho Pharmaceutical Corp. v. American Hospital Supply*, 186 U.S. P.Q. 501, 510 (S.D.Ind.1975), *aff'd.*, 534 F.2d 89 (7th Cir.1976).

83. It is also important that the claims of the four patents involved in this lawsuit could use the terms "comprising" or "consisting essentially of" in describing the claimed inventions. As stated in *Reese v. Hurst, et al.*, 661 F.2d 1222, 211 U.S.P.Q. 936, 943 (C.C.P.A.1981), now part of the Court of Appeals for the Federal Circuit, at p. 943:

The answer to this contention is that the count is a comprising-type count, which, by definition, does not exclude the presence of other steps, elements, or materials. *In re Fenton*, 59 C.C.P.A. 708, 451 F.2d 640, 171 USPQ 693 (1971); P. Rosenberg, Patent Law Fundamentals 14–15 (1980); I. Kayton, Patent Preparation & Prosecution Practice § 3, at 2 (1976). Thus, in the absence of evidence

of record showing that the presence of HF in the phosphoric acid stripping solution renders the process of the court inoperative, Reese's argument must fall.

■ 84. Dr. Short testified that the bromine content (0.5%) of the Gartner resin is insignificant, and that the Gartner resin has a ratio of resin to $I_2$ to KI of 1.0 to 1.0 to 0.7, which is the same as the fifth stoichiometric ratio set forth in Table I of the Hatch patents; and that the Gartner resin would be a mixed form polyhalide wherein the Hatch claim values would be a = 0.4 and b = 0.3. The words of claims 1 and 3 of the Hatch '183 patent and claims 1 and 6 of the Hatch '529 patent are directly readable on the Gartner resin and the method of disinfecting water using said resin.

■ 85. Dr. Lambert also testified that the bromine content was minor and insignificant in Gartner's resin, and that it is essentially a strong based triiodide resin. On normal flow up through the Pocket Purifier, he found no iodine eluted because it passes through the activated charcoal at the top of the Pocket Purifier. The words of the '860 patent claims 4 and 5 are directly readable on the Gartner resin used in a Pocket Purifier.

■ 86. The words of claims 1, 2, and 3 of the '665 patent are also readable on the process used to prepare the Gartner resin for the Calco Pocket Purifier.

*The Doctrine of Equivalents and File Wrapper Estoppel*

87. "The doctrine of equivalents comes into play only when actual literal infringement is not present. Under the doctrine of equivalents, an accused product that does not literally infringe a structural claim may yet be found an infringement if it performs substantially the same function in substantially the same way to obtain the same result as the claimed product or process." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

\* \* \*

"Courts have also recognized that to permit imitation of a patented invention which

does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing, *id.*, 339 U.S. at 607, 70 S.Ct. at 856," *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983).

■ 88. There is infringement in substance in this case, because the Calco Pocket Purifier resin product (using either the November 4, 1980 batch or the Gartner revised resin) performs substantially the same function, in substantially the same way, to obtain the same result as the products and methods set forth in the triiodide resin disinfectants of the '183, '529, '860, and '665 patents.

89. The '860 patent claims referred to above describe a demand bactericide resin "consisting essentially of" triiodide groups on a base resin which is a quaternary ammonium anion exchange resin. This is the basic and first patent in the entire field of water disinfectants which discloses a demand bactericide resin. The later issued Hatch '183 and '529 patents were granted as improvements which cover a demand bactericide resin still comprised primarily of the triiodide resin but also include about 30 to 40% pentaiodide groups. Both in substance and in form the November 4, 1980 resin and the Gartner resin are making direct use of the claimed inventions.

■ 90. The defendants at trial asserted file wrapper estoppel arguments. Under the law, if there is literal infringement, then file wrapper estoppel is not even applicable or relevant. *Fromson v. Advance Offset Plate Inc.,* 720 F.2d 1565, 1571 (Fed. Cir.1983); and *Glaros v. H.H. Robertson Co.,* 615 F.Supp. 186, 227 U.S.P.Q. 448, 452 (N.D.Ill.1985).

91. Defendants argument on file wrapper estoppel is that Lambert-Fina, and later, Hatch, disclaimed bromine containing resins during the prosecution of their patent applications due to the presence of the earlier Mills '363 patent. The Mills patent 3,462,363 disclosed a tandem resin system where the water is first contacted with a resin heavily loaded with bromine which easily dissociates in the treated water to kill the germs; and then the water is passed through a second scavenger resin to remove the high level of eluent bromine. Mr. Gartner himself had said that Mills had "no bearing" on the triiodide resin concept.

■ 92. The amendments made to the claims of the '183, '529, '860, and '665 patents never stated that any or all amounts of bromine were specifically excluded. In fact, the language used in all the patent claims such as "consisting essentially of" or "comprising" is language recognized under the law, *Air Products v. Chas. S. Tanner Co.,* 219 U.S.P.Q. 223, 249 (D.C.S.C. 1983); and *Reese v. Hurst, et al.,* 661 F.2d 1222, 211 U.S.P.Q. 936, 943 (C.C.P.A.1981), as not excluding minor amounts of other ingredients which have little, if any, effect on the performance or characteristics of the composition or method.

■ 93. As stated in *Hughes Aircraft, supra,* 717 F.2d at 1363:

Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero.

And, as stated in *Glaros v. H.H. Robertson Co., supra,* 615 F.Supp. 186, 227 U.S.P.Q., at 452–453 (N.D.Ill.1985).

Whenever the doctrine of file history estoppel is invoked, a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender. The fact that claims were narrowed does not always mean that the doctrine of file history estoppel completely prohibits a patentee from recapturing some of what was originally claimed. *Bayer Aktiengesellschaft v. Duphar International Research B.V.,* 738 F.2d 1237, 1243, 222 U.S.P.Q. 649, 653 (Fed. Cir.1984).

When these criteria are applied to the case at hand, it is seen that the only thing that was surrendered with respect to Mills '363 was usage of a highly loaded bromine resin system which must be used in tandem with a second scavenger resin to take up the eluent bromine which freely dissociates into the treated water.

94. There was no surrender in any of the four patents '183, '529, '860, and '665 of the concept that another person could add in approximately ½% bromine (which has no effect whatsoever on the performance of the resin), and thereby avoid the scope and spirit of the patented inventions.

*Unfair Competition*

95. Unfair competition has also been charged against the defendants Calco and Gartner, pursuant to the complaint ¶ 14, pretrial order stipulated fact # 11, and pretrial order page 28, ¶¶ 8 to 14. Jurisdiction is under 28 U.S.C. § 1338.

■ 96. A distinct cause of action for unfair competition may arise from the same operative facts that give rise to a cause of action for patent infringement where the patent infringement cause of action does not preempt the cause of action for unfair competition. Technical information may be misappropriated, to obtain an unfair competitive advantage, giving rise to a cause of action for unfair competition, and the misappropriated information may be used in a manner which could give rise to a cause of action for patent infringement. *Schreyer v. Casco Products Corp.*, 190 F.2d 921 (2d Cir.1951).

■ 97. It is shown from the trial evidence that the defendant Gartner originated his contacts with Aqua-Chem on the triiodide resin products on the basis that he was doing consulting work for Brunswick, and that he could interest Brunswick in taking a license from Aqua-Chem, and he also knew what WPCS's position was (Gartner August 24, 1979 letter): "The entire base of WPCS is the exclusive license to manufacture and sell triiodide resin trademarked as "Triocide".

98. While defendant Gartner's discussions and negotiations with Aqua-Chem and Brunswick were ongoing, and with knowledge that WPCS already held the exclusive patent license on the resins for products containing less than 100 cc of same, and that he had been refused a license for that defined product area himself, Mr. Gartner took the Aqua-Chem resin formula to Calco in August-September of 1980. He did not advise either WPCS or Aqua-Chem that he was doing this. Shortly thereafter, Mr. Gartner licensed Calco on September 24, 1980 to manufacture and sell resin containing products (*e.g.*, the Pocket Purifiers of less than 100 cc size). In this connection, he gave Calco the Aqua-Chem resin formula, and assisted Calco in requesting EPA approval on their product, wherein Calco claimed that their product was "very similar" to the already registered product called the Walbro Water Purifier, which was the competing product sold by WPCS.

*Damages*

■ 99. The damage done by these acts was significant. It led to WPCS losing its exclusive position in the field of small sized water purifier products containing less than 100 cc of resin, and it foreclosed WPCS/WTC's ability to have their water purifier product marketed through one or more large international corporations. It caused a breakdown in the exclusive license relationship between WPCS and Aqua-Chem and KSURF, and eventually led to the termination of that relationship by Aqua-Chem, which was the entire base of the business for WPCS. KSURF lost substantial expenditures of time and money in their development of the inventions and their licensing program for same. WPCS had paid many thousands of dollars to develop its exclusive position in this product line area, including but not limited to the payment of approximately $150,000 in exclusive license fees to Aqua-Chem, and another $300,000 to $400,000 that had been expended by WPCS and WTC on the development of their water purifier business. The evidence makes clear, however, that the product in the hands of WPCS had, at the time of the infringement, achieved no significant marketing success.

100. Defendants Calco and Gartner sold over $700,000 of the accused products and some bulk resin as well.

■ 101. As stated in "Walker on Patents", Vol. 2, § 8:16, at p. 533:

In addition to the clear language of the statute, it is settled case law that the notice requirement of Section 287 does

not apply where the patent is directed to a process or method.

*Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578 (Fed.Cir.1983) states the same rule of law, *i.e.*, that the patent law section, 35 U.S.C. § 287, governing limitation of damages for failure to mark or give notice applies only to "a patented article" and not to a process or method. Three of the four patents in suit (the '529, '860 and '665 patents) are directed to method or process claims. Thus, defendants' argument at trial that damages should only go back to the date they were notified by patentees is incorrect. Defendants Calco and Gartner both had knowledge of the four patents in September, 1980 or earlier. Thus, damages should begin to run as of the November 4, 1980 batch.

 102. Defendants argued at trial that the first Calco resin batch was used only for testing, but the court concludes from the evidence that some Pocket Purifier straws were also made and sold from the November 4, 1980 Batch.

103. The defendants' uses of the patented inventions were not *de minimis*, in that their activities started on November 4, 1980 and have continued right up through the time of trial; and even their testing work for the EPA was for the commercial purpose of gaining registration so they could compete against WPCS/WTC's water purifier cup. "Deller's Walker on Patents," 2d edit. (1972), Vol. 7, § 508, states the same rule of law that even a single manufacture, use or sale of the patented invention is sufficient to constitute infringement.

 104. Damages are governed by 35 U.S.C. §§ 284–289. The plaintiffs seek lost profits as damages in this case, and the infringers' profits may be used to estimate plaintiffs' lost profits. *Kori Corp. v. Wilco Marsh Buggies*, 761 F.2d 649, 225 U.S.P.Q. 985, 978–89 (Fed.Cir. 1985). As testified to by Mr. Davis at the trial, with a $1.62 production cost per straw, defendants' profit margin on the Pocket Purifier was conservatively calculated to be $4.38 on a wholesale price of $6.00 per Pocket Purifier straw. The actual retail price was approximately $9.00 to

$12.00 per unit. Thus Calco's profit margin is $4.38 divided by $6.00; which equals a 73% profit margin. If the amount of lost profits cannot be determined accurately and with precision, any doubts regarding the amount should be resolved against the infringer. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983).

105. Even Calco was paying Mr. Gartner a royalty fee from 5% to 10% on products sold, and had already paid Mr. Gartner approximately $35,000 in license fees on the Pocket Purifier as of the time of trial. WPCS also lost their exclusive license position with Aqua-Chem in which they had invested $155,000; and WPCS/WTC also effectively lost a portion of the $300,000 to $400,000 that had been invested in their water purifier business to develop their exclusive position.

 106. The judgment of the court is that a 60% figure be used for damages herein, and that plaintiffs WTC, WPCS and KSURF be awarded for damages 60% of defendants' total sales of the accused resin containing products. *King Instrtument Corp. v. Otari Corp.*, 767 F.2d 853, 226 U.S.P.Q. 402 (Fed.Cir.1985); *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 225 U.S.P.Q. 985 (Fed.Cir. 1985); *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11 (Fed. Cir.1984); *Bio-Rad Laboratories, Inc v. Nicolet Instrument Corp.*, 739 F.2d 604 (Fed.Cir.1984); *Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*, 224 U.S. P.Q. 679 (N.D.Tex.1984).

 107. Damages are governed by 35 U.S.C. §§ 284–289. The plaintiffs seek lost profits as damages in this case and the infringers' profits may be used to estimate plaintiffs' lost profits. *Kori Corp. v. Wilco Marsh Buggies*, 761 F.2d 649, 225 U.S.P.Q. 985, 987–89 (Fed.Cir. 1985). The only figure in evidence which indicates to the court the gross sales of defendant infringers is the figure $700,000, and 60% of this figure would equal $420,-000. The claim of WPCS for $155,000 invested in the license position with Aqua-Chem and $300,000 to $400,000 invested in

the water purifier business to develop their exclusive position in the market, cannot be justified. At the conclusion of this case, WPCS will have regained their exclusive position in the market, and the market for this product, which they developed, whatever the expenditures therefor, was a modest market indeed. The court's assessment of this aspect of the claim of WPCS is that it should be valued at $100,000 for the damage to their marketing opportunities over the period of the duration of the marketing of the infringing product.

108. The Supreme Court has also construed the interest provision of 35 U.S.C. § 284 as giving a court authority to fix prejudgment interest without having to first find an "exceptional circumstance." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 653, 103 S.Ct. 2058, 2061, 76 L.Ed.2d 211 (1983). The court awards prejudgment interest in this case to the plaintiffs WTC, WPCS and KSURF.

109. Thirty five U.S.C. § 284 permits the court to increase damages "up to three times the amount found or assessed." Willful infringement is a finding of act based on the totality of the circumstances presented in the case. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 226 U.S.P.Q. 402 (Fed.Cir.1985).

110. To willfully infringe, the patent must exist and the accused infringers must have knowledge of same. Both criteria exist in this case. There was no reliance on timely advice of counsel by defendants in this case. *Underwater Devices Inc. v. Morrison-Knudson Co.*, 717 F.2d 1380 (Fed.Cir.1983). *Rosemount Inc. v. Beckman*, 727 F.2d 1540 (Fed.Cir.1984).

111. The circumstances of copying in this case justify a finding of willful infringement. *Lam Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 475 (10th Cir.1982). The defendants' detailed examination of the patented resin products sold by WPCS, as well as the detailed examination of the patents themselves prior to manufacturing, using and selling the Pocket Purifier straws, shows the willfulness and copying that was involved. *Lam Inc.*

*v. Johns-Manville*, 206 U.S.P.Q. 452 (D.Colo.1979), *aff'd*, 668 F.2d 462 (10th Cir. 1982). *Milgo Electronic Corp. v. United Business*, 623 F.2d 645 (10th Cir.1980). The infringements in this case have been willful and justify increased damages. Based on the circumstances herein, the court concludes that the damages should be doubled.

112. In that the circumstances of this case show an exceptional case involving willful infringement, the court also grants reasonable attorneys fees to plaintiffs WTC, WPCS, and KSURF under the provisions of 35 U.S.C. § 285.

113. The Lambert-Fina '860 and '665 patents an the Hatch '183 and '529 patents are valid and infringed by defendants Calco and Gartner.

114. By way of summary, plaintiffs are awarded $420,000 in damages to compensate for lost profits, and an additional $100,000 in damages to compensate for loss of marketing opportunities. This sum will be doubled by virtue of the willfulness of defendants' conduct, resulting in a total damage award of $1,040,000. Plaintiffs are additionally awarded prejudgment interest and are requested to submit an order to the court on the subject of prejudgment interest within ten days of the date of this order.

## JUDGMENT ORDER

Judgment shall be entered for the plaintiffs WTC, WPCS, and KSURF in accordance with the findings, and awarding to them their costs and attorneys fees; and the defendants Calco and Gartner and their officers, agents, servants and employees are hereby permanently enjoined from infringement of the Lambert-Fina '860 and '665 patents and the Hatch '183 and '529 patents.

In view of this court's finding that this is an exceptional case within the meaning of 35 U.S.C. § 285, the court assesses defendants Calco, Ltd. and William J. Gartner with the plaintiffs' attorneys fees, the amount of which will be determined in a separate hearing.

Judgement, therefore, is granted to plaintiffs in the amount of $520,000 in actual damages plus an additional $520,000 based on willfulness of defendants' conduct. Further, plaintiffs' attorneys fees and costs will be awarded in an amount to be determined hereafter. Plaintiffs shall submit their application for costs and fees within 30 days, with 20 days thereafter for defendants to answer and 15 days for plaintiffs' reply.