**Steven P. SHEARING,**
**Plaintiff–Appellee,**

v.

**IOLAB CORPORATION and Johnson &**
**Johnson, Defendants–Appellants.**

**No. 91–1343.**

United States Court of Appeals,
Federal Circuit.

Sept. 11, 1992.

Morton R. Galane, Las Vegas, Nev., argued for plaintiff-appellee. With him on the brief were Thomas J. Tanksley, R.L. Rickdall and Philip M. Ballif. Also on the brief was Bradford E. Kile, Baker & McKenzie, Washington, D.C.

David F. Dobbins, Patterson, Belknap, Webb & Tyler, New York City, argued for defendants-appellants. With him on the brief was Harman Avery Grossman. Also on the brief were Don K. Harness, Paul A. Keller and Stephen J. Foss, Harness, Dickey & Pierce, Troy, Michigan.

Before NEWMAN, RADER, and ALARCON [1], Circuit Judges.

RADER, Circuit Judge.

Dr. Steven P. Shearing, inventor and owner of U.S. Patent No. 4,159,546, sued Iolab and Johnson & Johnson for breach of a patent licensing agreement. Iolab filed a counterclaim to declare the '546 patent invalid based on prior inventorship, obviousness, and concealment of the best mode of carrying out the invention. After a lengthy trial, the jury rejected Iolab's challenges to validity of the '546 patent. The United States District Court for the District of Nevada denied appellants' motions for judgment notwithstanding the verdict and, in the alternative, a new trial. Because on this record the jury could reasonably have reached its verdict, this court affirms.

## BACKGROUND

The '546 patent claims a method for inserting an artificial optic lens into the posterior chamber of the eye. The artificial lens is a convex disc five or six millimeters in diameter. Two resilient curved strands, called J-loops or open-loops, extend from the disc. These strands hold the disc in place relative to the pupil.

Before the '546 method, surgeons had unsuccessfully tried to replace the diseased natural lens of cataract victims with an

---

1. Honorable Arthur L. Alarcon, United States Court of Appeals for the Ninth Circuit, sitting by designation.

open-loop artificial lens. These attempts in the 1950s to place a J-loop artificial lens in the anterior chamber (in front of the iris) often caused hemorrhaging or rupturing. For this reason, surgeons only implanted an artificial lens as a last resort. In the 1960s and 1970s, surgeons experimented with implanting different types of artificial lenses in the posterior chamber of the eye, behind the iris. These experiments did not successfully secure the artificial lens behind the pupil.

Dr. Shearing was the first to claim a method for implanting an open-loop artificial lens into the posterior chamber of the eye. The two J-loops, whose loop-to-loop length is slightly greater than the posterior chamber, press gently against the chamber walls and center the lens behind the pupil. Dr. Shearing claimed the method for inserting the open-loop artificial lens through the pupil into the eye's posterior chamber. Claim 2 of Dr. Shearing's '546 patent states:

> [I]nserting said lens through the pupil with said first [inferior loop] strand first followed by said lens body ... directing said first strand into the posterior chamber, further urging said lens through the pupil and into the posterior chamber thereby compressing said first strand within the posterior chamber until said second [superior loop] strand passes through said pupil and into the posterior chamber, and directing said second strand opposite said first strand in the posterior chamber, whereby the entire lens is located and fixed within the posterior chamber and posterior to the iris.

Figures 5–7 of the '546 patent illustrate this method:

FIG. 5     FIG. 6     FIG. 7

Once Dr. Shearing designed the lens assembly, he worked with Iolab to manufacture sterile, implantable prototypes. On March 22, 1977, Dr. Shearing first implanted a J-loop artificial lens in the posterior chamber of a patient's eye. Three months later, Dr. Shearing filed a patent application. In a 1978 patent licensing agreement, Dr. Shearing granted Iolab an exclusive license under the patent. Iolab paid Dr. Shearing royalties on sales of Iolab's lens.

Later a dispute arose between Iolab and Dr. Shearing over the licensing agreement. In 1985, Dr. Shearing filed this action against Iolab for breach of the licensing agreement. Four years later, Iolab counterclaimed to challenge the validity of

the '546 patent. Besides asserting that Dr. Shearing concealed the best mode for implanting open-loop artificial lenses, Iolab contended that Dr. William Simcoe's prior work anticipated or rendered obvious the invention claimed in the '546 patent. As part of Iolab's case, Dr. Simcoe, an ophthalmic surgeon, testified that he began working in 1975 to place an artificial lens in the posterior chamber of the eye. Dr. Simcoe stated that his implantation surgery included open-loop lenses. Other witnesses for Iolab stated that Dr. Simcoe disclosed his work as early as 1976 at professional trade meetings.

At trial, Dr. Shearing attacked the credibility and probity of Dr. Simcoe's claims of prior inventorship. To impeach medical records of Dr. Simcoe's early implantations, Dr. Shearing produced evidence that the body of one of Dr. Simcoe's patients, since deceased, had been exhumed. Examination of the cadaver did not reveal implantation of J-loop lenses at all.

In addition to other impeaching witnesses, Dr. Shearing called as a witness Mr. Donald Streck, an attorney for whose client Dr. Simcoe had testified in an earlier legal proceeding. Mr. Streck contradicted Dr. Simcoe's testimony about prior work with intraocular lenses.

The court first tried the issues of prior inventorship and obviousness. After a one and a half week trial, the jury returned a verdict for the plaintiff. Following a recess, the parties presented a two and a half day trial on the issue of compliance with the best mode requirement. *See* 35 U.S.C. § 112 (1988). The jury returned a verdict in favor of Dr. Shearing.

## DISCUSSION

### Standard of Review

■ On appeal after denial of a motion for JNOV, the appellant must prove that the record lacks substantial evidence to support the jury's verdict. *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1512, 220 USPQ 929, 936 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). Substantial evidence is such relevant evidence, considering the record as a whole, on which a reasonable jury could base the verdict under review. *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). In review of a jury's verdict on patent validity, this court presumes the jury made the proper findings to support its verdict. *Shatterproof Glass v. Libbey–Owens Ford Co.*, 758 F.2d 613, 619, 225 USPQ 634, 637 (Fed.Cir.), *cert. denied*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). This court reviews the denial of a motion for new trial under the abuse of discretion standard. *Railroad Dynamics*, 727 F.2d at 1512.

### Anticipation and Obviousness

■ This court first reviews whether Dr. Simcoe's method for implanting artificial lenses anticipated the '546 patent. *See* 35 U.S.C. § 102(a) (1988). To prove anticipation, Iolab must have convinced the jury with clear and convincing evidence at trial that Dr. Simcoe disclosed in advance of Dr. Shearing's invention each and every element of the '546 patent's claims. *Diversitech Corp. v. Century Steps*, 850 F.2d 675, 677, 7 USPQ2d 1315, 1317 (Fed.Cir.1988).

This court also reviews whether Dr. Simcoe's work rendered the invention of the '546 patent obvious. To prove obviousness, Iolab must have convinced the jury that the '546 "subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art." 35 U.S.C. § 103 (1988).

■ The trial court correctly instructed the jury on the requirements of the law.[2]

2. The trial court appropriately tailored its instructions about patent law to meet the needs of its particular case and jury. For instance, after quoting from title 35 about the obviousness requirement, the trial court stated:

Here defendants contend that Dr. Shearing's patent is not valid because whatever it discloses was obvious. Therefore, you will have to decide whether what Dr. Shearing invented was obvious or not in the technical field with which we are concerned.

This court must determine whether substantial evidence supports the jury's conclusion that Iolab did not overcome the presumption of validity for the '546 patent. *See Perkin–Elmer*, 732 F.2d at 894.

■ The jury heard Dr. Shearing testify that in 1976 he invented the method he later claimed in the '546 patent. In addition, the jury heard considerable evidence discrediting Dr. Simcoe's testimony that he invented and disclosed the same method or a method rendering Dr. Shearing's work obvious before his 1977 patent application. For instance, a witness for Iolab testified about seeing a home movie in 1976 at the annual meeting of the American Academy of Ophthalmology depicting posterior chamber lens implantation by Dr. Simcoe. Iolab, however, did not produce the movie. Moreover several witnesses recalled either that the movie involved anterior chamber implantation in the eyes of animals or that the movie was shown in 1978. This proof is some of the testimony which supplied substantial evidence to support the jury's finding that Shearing first invented the posterior chamber implantation method.

The jury also reviewed the medical records of Dr. Simcoe's 750 implant surgeries before Dr. Shearing's 1977 patent application. Only two of these records (the same patient having each eye operated on at different times) refer to implantation of an open-loop lens in the posterior chamber of the eye. The jury heard evidence that these two medical records contain notations in different inks from the ink of Dr. Simcoe's signature. Moreover the typewritten portion of the report states that the lens was implanted in the pupil rather than in the posterior chamber. Finally, the jury

heard that these two records referred to operations on a patient named Mr. Claude W. Simons, since deceased. Upon exhumation of Mr. Simons' body, an examination showed Dr. Simcoe had not implanted J-loop artificial lenses at all.

Other witnesses testified about watching Dr. Simcoe implant open-loop artificial lenses in the posterior chamber. The jury also heard evidence impeaching the credibility of this testimony. Some of these witnesses recalled details at trial that they had not mentioned at all in prior depositions. Some witnesses portrayed as indifferent or uninterested had in fact personal or financial ties to Dr. Simcoe.

The jury observed the witnesses' demeanor and drew conclusions about credibility during the course of the trial. The jury concluded that the '546 patent was valid; the trial judge found no reason to overturn that holding. This court has no difficulty discerning ample evidence in the record to show that a reasonable jury could have reached that result.

*Best Mode*

■ This court next reviews compliance with the best mode requirement. *See* 35 U.S.C. § 112 (1988). Section 112 obligates disclosure of the best mode of carrying out an invention. *Id.* Thus, to prove failure to disclose the best mode, a defendant must show both that the inventor contemplated a better mode for practicing the invention at the time of the patent application and that the inventor concealed that mode from the public. *Chemcast Corp. v. Arco Indus.*, 913 F.2d 923, 927–28, 16 USPQ2d 1033, 1036–37 (Fed.Cir.1990). This court must determine whether, on this record, a rea-

---

To do that you must make three factual determinations, remembering that the burden rests upon the defendants to establish all factual determinations by evidence which is clear and convincing.

The first thing you must decide is the scope and content of prior art. In other words, what was the body of knowledge in that particular field at the time Dr. Shearing applied for his patent?

When we talk about prior art, the general knowledge in this particular field is what we are talking about.

In determining prior art, you may consider prior patents, prior devices, and publications dated prior to June 15, 1976, prior work done in the United States by others in the same field even if such work does not contain all the elements of a claim, and anything else that shows the general level [of knowledge in the field]....

The trial court thus put the requirements of the law into terms applicable to its case and understandable to its jury.

sonable jury could have concluded "that defendants have not met their burden of proving a best mode violation." *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1210, 18 USPQ2d 1016, 1024 (Fed.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991); *see also* 35 U.S.C. § 282 (1988).

■ Iolab contends Dr. Shearing concealed superior loop compression, the best mode for implanting an open-loop lens. Superior loop compression means bending the top (superior) as well as the bottom (inferior) open loops to reduce the size of the lens assembly as it passes through the pupil. Iolab argues that, despite Dr. Shearing's use of superior loop compression in 1976 and early 1977, the '546 patent discloses only inferior loop compression. The record, however, contains substantial evidence supporting the jury's verdict.

Dr. Shearing testified that no best implantation mode occurred to him during his first posterior chamber insertions. He testified that at the time of his patent application, he embraced any method which placed the lens in the correct position in the posterior chamber of the eye. He also testified that he did not exclusively use superior loop compression during the nineteen operations he performed before the patent application. In sum, Dr. Shearing testified that he had conceived of no better way to practice the invention at the time of his patent application.

The jury also heard testimony refuting any concealment by Dr. Shearing of superior loop compression. In addition to the claim language about "directing" the second strand, at least two references in the '546 specification suggest superior loop compression:

> Thus, since full compression of at least one of the strands during implantation is essential according to the procedure described herein....

U.S. Patent No. 4,159,546, col. 5, lines 18–20. This statement suggests compression of more than just one strand or loop. The specification also states:

> directing said second strand against the ciliary body opposite said first strand....

*Id.* at col. 6, lines 8–9. This statement would also teach one skilled in the art to compress both strands.

The jury found no best mode violation. Indeed the record contains substantial evidence that Dr. Shearing contemplated no better mode at the time of his application, and, in any event did not conceal any better mode of practicing the invention of the '546 patent. The record contains ample evidence to permit a reasonable jury to reach this jury's conclusion.

### Attorney–Client Privilege

Finally, this court must determine whether the trial court committed reversible error in allowing Mr. Donald Streck, an attorney who had interviewed Dr. Simcoe, to testify about his discussions with Dr. Simcoe. Iolab contends that this ruling violated Dr. Simcoe's attorney-client privilege.

■ The record, however, shows that the district court properly ascertained that Mr. Streck only testified about discussions at a time when he was not Dr. Simcoe's attorney. Mr. Streck interviewed Dr. Simcoe as a potential witness in a trial involving Mr. Streck's corporate client. The attorney-client privilege "encourage[s] full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Thus, the privilege protects a client's confidential communications to an attorney necessary to obtain legal counselling. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). In this case, the district court properly discerned that Dr. Simcoe was not Mr. Streck's client at the time of the communications about which Mr. Streck testified.

In addition, this court notes that Iolab did not object to Dr. Shearing's identification of Mr. Streck as a witness on his witness list. This list gave Iolab over two years' notice of Mr. Streck's impending tes-

timony. Moreover, Iolab also listed Mr. Streck as a potential witness. During trial, Iolab did not object until two days after Mr. Streck's testimony. The absence of a prompt objection undercuts Iolab's assertion of an attorney-client privilege. This court discerns no reversible error in the district court's evidentiary ruling allowing Mr. Streck to testify.

## CONCLUSION

In reaching its verdict, the jury applied the law of 35 U.S.C. §§ 102, 103, and 112 to the evidence. The record amply supports the jury's findings, inferences, and verdict. The Federal Rules of Civil Procedure, as adopted by Congress, expressly contemplate that juries shall apply the law in accordance with instructions. Fed.R.Civ.P. 49(b) and 51. The record in this case supports the jury's findings of fact and application of the law. Indeed the district judge denied Iolab's motion for JNOV. This court affirms the judgment.

AFFIRMED.