45 F.3d 443
 35 U.S.P.Q.2d 1278
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
OSCAR MAYER FOODS CORPORATION, Plaintiff-Appellee,
v.
CONAGRA, INC., Defendant-Appellant,
and
Swift-Eckrich, Inc., Defendant.
 Nos. 94-1247, 94-1248.
 United States Court of Appeals, Federal Circuit.
 Dec. 22, 1994.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
Jan. 31, 1995.
 
 Before MICHEL, Circuit Judge, BENNETT, Senior Circuit Judge, and RADER, Circuit Judge.
 BENNETT, Senior Circuit Judge.
 
 
 1
 ConAgra, Inc. (ConAgra) appeals from a judgment entered against it on a jury verdict in favor of Oscar Mayer Foods Corporation (OMFC). Oscar Mayer Foods Corp. v. ConAgra, Inc., 31 USPQ2d 1173 (W.D.Wis.1994). The jury found that ConAgra had infringed OMFC's patents and that ConAgra failed to prove clearly and convincingly facts supporting its contention that OMFC's patents are invalid. For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 2
 OMFC sued ConAgra for infringing two patents, both of which pertain to preserving food products. In particular, both patents teach that adding a lactate salt in an amount from 1% to 7% by weight to cooked (but not sterilized), anaerobically packaged, uncured fish or poultry may help prevent botulism. OMFC's U.S. Patent 4,789,729 (the '729 patent), which issued in 1989, claims a process. OMFC's U.S. Patent 5,017,391 (the '391 patent), which issued in 1991, claims foodstuffs made by the process. Both patents take their filing dates from the same application, filed in December 1985.
 
 
 3
 Botulism is a serious, potentially fatal form of food poisoning caused by the bacteria Clostridium botulinum (C. bot.). The bacteria has both a dormant state and a vegetative state. In its vegetative state C. bot. produces the toxin which causes botulism. Botulism is extremely rare, requiring the concurrence of several conditions. Because C. bot. grows only in the absence of oxygen, food must be anaerobically packaged for botulism to occur. The food must have an appropriate pH level. The food must be sufficiently moist. The food must be stored at a sufficiently high temperature. Even where C. bot. has entered its vegetative state, cooking the food before it is eaten breaks down the toxin.
 
 The Patents in Suit
 
 4
 The broadest claim of the '729 patent for OMFC's process reads:
 
 
 5
 1. A method for delaying Clostridium botulinum growth in a foodstuff selected from the group consisting of fish and poultry, the method consisting essentially of:
 
 
 6
 (a) adding a lactate slat [sic] to a fresh foodstuff selected from the group consisting of fish and poultry, said lactate salt being added in an amount of about 1% to about 7%;
 
 
 7
 (b) cooking the foodstuff at high humidity to a temperature sufficient to cook the foodstuff but not sufficient to sterilize the foodstuff;
 
 
 8
 (c) cooling the cooked foodstuff; and
 
 
 9
 (d) packaging the cooked foodstuff in a plastic barrier package.
 
 
 10
 Claim one of the '391 patent, which is the broadest of OMFC's product claims, reads:
 
 
 11
 1. In a packaged foodstuff, said foodstuff being selected from the group consisting of fish and poultry, said fish or poultry being cooked, but not sterilized, being packaged in an anaerobic plastic barrier package and intended to be stored under refrigeration, said foodstuff being subject to the growth of Clostridium botulinum under temperature abuse, the improvement wherein the foodstuff comprises a lactate salt in an amount of from 1 to 7% by weight and sufficient to delay growth of Clostridium botulinum in the foodstuff.
 
 The District Court Proceedings
 
 12
 OMFC filed an infringement suit against ConAgra in the United States District Court for the Western District of Wisconsin. In a pretrial motion, ConAgra asked the court to rule that a process which includes a second salt such as sodium chloride or sodium tripolyphosphate does not infringe the '729 patent. The motion was denied.
 
 
 13
 At the close of OMFC's case-in-chief, ConAgra moved for judgment as a matter of law (JMOL), arguing that even if every other limitation were met OMFC had nonetheless failed to prove that ConAgra used the process of the '729 patent for the purpose of inhibiting the growth of C. bot. After this motion was denied, ConAgra noted that when inquiring into validity the court would have to use the same construction as had been adopted for infringement. ConAgra argued that therefore the inventors' intent in using sodium lactate could not be considered when determining obviousness.
 
 
 14
 ConAgra sought to introduce evidence that in its process a second salt (either sodium chloride or sodium tripolyphosphate) reacted synergistically with sodium lactate to produce unexpectedly good results. The district court excluded this evidence, and later charged the jury over ConAgra's objection that the use of table salt in the accused process did not affect the basic and novel characteristics of the claimed process.
 
 
 15
 ConAgra urged the court to submit the case to the jury by means of an elaborate special verdict form. The court declined, relying instead on jury instructions. ConAgra objected to the instructions on obviousness and damages, as well as to the instruction regarding the use of a second salt in the process. The jury returned a verdict in favor of OMFC. The court denied ConAgra's post trial renewal of its JMOL motion and its motion for a new trial. This appeal followed.
 
 DISCUSSION
 Standard of Review
 
 16
 ConAgra ascribes several errors to the trial court. It argues that the court misstated the law in its jury instructions and that it should have used a special verdict form. It argues that the trial court should have granted its renewed motion for JMOL. Finally, ConAgra argues that the trial court should have granted its motion for a new trial.
 
 
 17
 In reviewing the trial court's judgment, this court examines the content of jury instructions for prejudicial legal error. Delta-X Corp. v. Baker Hughes Prod. Tools, Inc., 984 F.2d 410, 415, 25 USPQ2d 1447, 1450 (Fed.Cir.1993). A new trial will be ordered only when errors in the instructions as a whole clearly misled the jury. Delta-X, 984 F.2d at 415, 25 USPQ2d at 1450-51. To succeed, ConAgra must show (1) that the jury instructions, read in their entirety, were incorrect and (2) that it requested instructions which could have eliminated the error. Id., 984 F.2d at 415, 25 USPQ2d at 1451; Goodwall Constr. Co. v. Beers Constr. Co., 991 F.2d 751, 755, 26 USPQ2d 1420, 1423 (Fed.Cir.1993). Regarding the form of the instructions, this court will reverse a judgment only if the trial court abused its discretion when selecting the manner in which to submit a case to the jury. Railroad Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506, 1515, 220 USPQ 929, 938 (Fed.Cir.), cert. denied, 469 U.S. 871 (1984).
 
 
 18
 When an appellant contests the denial of a renewed motion for JMOL, this court presumes that, on issues of law with underlying issues of fact, the jury made the proper findings necessary to support its verdict. Shearing v. Iolab Corp., 975 F.2d 1541, 1544, 24 USPQ2d 1133, 1136 (Fed.Cir.1992). The jury expressly found that ConAgra infringed OMFC's patents. To succeed on appeal, ConAgra must prove (1) that the jury's findings, whether presumed or express, are not supported by substantial evidence or (2) the facts properly found cannot support the jury's verdict. Mentor Corp. v. Coloplast, Inc., 998 F.2d 992, 994, 27 USPQ2d 1521, 1524 (Fed.Cir.1993); Wang Lab., Inc. v. Toshiba Corp., 993 F.2d 858, 863, 26 USPQ2d 1767, 1772 (Fed.Cir.1993); Standard Havens Prods. v. Gencor Indus., 953 F.2d 1360, 1367, 21 USPQ2d 1321, 1326 (Fed.Cir.1991), cert. denied, 113 S.Ct. 60 (1992). A finding is supported by substantial evidence if a reasonable juror could have made that finding upon considering the record as a whole. Wang, 993 F.2d at 863, 26 USPQ2d at 1772; Shearing, 975 F.2d at 1544, 24 USPQ2d at 1136; Standard Havens, 953 F.2d at 1367, 21 USPQ2d at 1326. The grant of a new trial is committed to the discretion of the trial court, which will be affirmed absent an abuse of discretion. Shearing, 975 F.2d at 1544, 24 USPQ2d at 1136; Standard Havens, 953 F.2d at 1367, 21 USPQ2d at 1326.
 
 Obviousness
 
 19
 1. Jury Instructions.
 
 
 20
 ConAgra argues that the trial court misstated the law of obviousness in its jury charge. A patent is invalid if the claimed subject matter would have been obvious to one of ordinary skill in the art at the time of invention. 35 U.S.C. Sec. 103 (1988). Obviousness is a question of law with four factual predicates: the scope and content of the prior art, the differences between the subject matter claimed and the prior art, the level of ordinary skill in the art, and other objective indicia of nonobviousness such as commercial success, long felt but unsolved need, and acquiescence of others in the industry to the patent's validity. Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).
 
 
 21
 ConAgra argues that OMFC's contribution to the art was objectively obvious. Per ConAgra, it would have been obvious to one of ordinary skill in the art to use sodium lactate as one possible solution to certain problems other than preventing botulism, such as shortness of shelf life. ConAgra contends that it is impermissible to consider an inventor's subjective purpose when determining whether claimed subject matter is obvious. Contrary to ConAgra's position, however, the problem an inventor professes to have solved is relevant in framing the obviousness inquiry.
 
 
 22
 ConAgra cites many cases for the proposition that discovering a new use for an old product does not entitle an inventor to a patent on the old product. E.g., In re Woodruff, 919 F.2d 1575, 1578, 16 USPQ2d 1934, 1936 (Fed.Cir.1990); Titanium Metals Corp. v. Banner, 778 F.2d 775, 782, 227 USPQ 773, 778 (Fed.Cir.1985). Although certainly true, that principle is inapplicable here. The novelty of the subject matter OMFC claimed was not an issue at trial. If the subject matter were old, OMFC could not now withdraw from the public domain that which was already in actual use merely because it discovered a new, additional use. The obviousness, however, of subject matter not now in use raises different concerns. A step that supplies an obvious, but perhaps impractical, solution to one problem may well provide a new, unexpected, and nonobvious solution to a different problem. The difference lies in the stated utility of the invention, i.e., the problem an applicant claims to have solved.
 
 
 23
 ConAgra argues that merely identifying a new purpose is not sufficient to overcome a prima facie case of obviousness, citing In re Dillon, 919 F.2d 688, 693-94, 16 USPQ2d 1897, 1902 (Fed.Cir.1990). Prima facie obviousness is a procedural tool employed in ex parte proceedings before the PTO. In re Oetiker, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed.Cir.1992). In litigation, an issued patent is presumed valid. 35 U.S.C. Sec. 282 (1988). Because of this presumption, the party opposing validity in litigation bears the burden both of proving by clear and convincing evidence facts establishing invalidity and also of coming forward with evidence to make out a prima facie case of obviousness. Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 291-92, 227 USPQ 657, 662-63 (Fed.Cir.1985). Because no statutory presumption of validity attaches during prosecution, it is far from clear that the requirements of a prima facie case were the same in Dillon as in Ashland. Even if prima facie obviousness as described in Dillon is sufficient to establish a prima facie case of obviousness in litigation as required under Ashland, the prior art cited by ConAgra and reviewed below was inadequate to establish such prima facie obviousness.
 
 
 24
 ConAgra also contends that, even if an inventor's purpose is relevant, the inventors in the case at bar did not set about to discover a method of inhibiting the growth of C. bot. It does not matter, however, what motivated an inventor to discover the claimed subject matter. The discovery may be by design, by accident, by a vision in a dream, by a sudden flash of genius, or by any other conceivable means. "Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. Sec. 103 (1988). The relevant consideration is the problem the patent applicant purports to have solved, regardless of the technique employed to achieve that solution. OMFC professes to have solved the problem of delaying the growth of C. bot. in anaerobically packaged, precooked, unsterilized, uncured poultry and fish products. Its patent is invalid if its solution to that problem would have been obvious to one of ordinary skill in the art.
 
 
 25
 The nature of the problem solved affects all of the four factual inquiries underlying obviousness. Prior art is relevant to the obviousness inquiry if it is analogous, i.e., if it is drawn from that inventor's field of endeavor or if it is "reasonably pertinent to the particular problem with which the inventor is involved." In re Paulsen, 30 F.3d 1475, 1481, 31 USPQ2d 1671, 1676 (Fed.Cir.1994) (emphasis added); Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., 21 F.3d 1068, 1072, 30 USPQ2d 1377, 1379 (Fed.Cir.1994); Wang, 993 F.2d at 864, 26 USPQ2d at 1773; In re Clay, 966 F.2d 656, 658, 23 USPQ2d 1058, 1060 (Fed.Cir.1992). Because the problem affects the definition of the prior art, it therefore affects each of the first three Graham factors: the prior art's scope and content, the art's level of ordinary skill, and the prior art's differences from the claimed invention. See Graham, 383 U.S. at 17. Also, objective indicia of nonobviousness are helpful only where there exists a nexus between the indicia and the patented invention. For example, the failure of others is probative only if they sought to overcome the problem the applicant claims to have solved. Similarly, commercial success is probative only if it reflects a demand for that inventor's solution to the problem, not a response to marketing efforts or an effect of some other cause.
 
 
 26
 ConAgra requested the district court to charge the jury that the inventors' purpose in adding lactate salts to the foodstuff was irrelevant when determining validity. As shown above, such an instruction would have been misleading. The problem the inventors in their application claim to have solved is relevant to the obviousness inquiry. We discern no prejudicial legal error in the trial court's jury instructions. ConAgra also argues that the trial court should have used special verdict forms instead of instructions with a general verdict form. Even if this court finds interrogatories and special verdicts particularly useful when reviewing the question of obviousness, see ROBERT L. HARMON, PATENTS AND THE FEDERAL CIRCUIT 404 (3d ed. 1994), the trial court did not here abuse its discretion, see Railroad Dynamics, 727 F.2d at 1515, 220 USPQ at 938 (discussing the standard of review), by submitting the case on a general verdict.
 
 
 27
 2. The Prior Art.
 
 
 28
 In addition to its arguments concerning the significance of motive, ConAgra also argues that OMFC's patent would have been obvious over the prior art presented at trial. Substantial evidence supported the implicit finding that, given the level of ordinary skill in the art, the claimed invention differed significantly from the prior art of pertinent scope and content. The references on which ConAgra relied most heavily are briefly considered below.
 
 
 29
 The first is a patent which teaches that washing raw foods in an aqueous sterilizing agent that may include sodium lactate will kill microorganisms which cause food poisoning. Ueno, U.S. Patent 4,592,892. That patent teaches contacting the surface of the foodstuff with a solution. Any addition of sodium lactate to the foodstuff itself is incidental and unmentioned. ConAgra admits that the foods in Ueno are cooked before being eaten. Thus, there was not even the potential for botulism. Ueno does not teach or suggest that adding sodium lactate to precooked, anaerobically packaged foods will inhibit the growth of C. bot.
 
 
 30
 ConAgra also relies on an unexamined Japanese application which discloses that sodium lactate enhances glycine's preservative properties against rope and slime bacteria without producing the undesirable side effects of browning or affecting flavor. Fukui, Kokai Tokkyo Koho Pub. No. 59-175870 (Published Oct. 4, 1984). Fukui teaches nothing about the effect of sodium lactate in an anaerobic environment. Indeed, Fukui reports generally unfavorable results from the use of sodium lactate without glycine.
 
 
 31
 ConAgra's next reference is a 1971 article by Dr. Angersbach which teaches the effect of sodium lactate on three types of bacteria. This report does not concern anaerobic bacteria such as C. bot. and teaches nothing about the effects of sodium lactate in poultry or fish. ConAgra also points to certain proceedings before the Food and Drug Administration. GRAS Status of Lactic Acid and Calcium Lactate, 49 Fed.Reg. 35366-67 (1984); Purac Inc.; Filing Petition For Affirmation Of GRAS Status, 50 Fed.Reg. 6252 (1985). Neither of these references teaches the use of sodium lactate to combat C. bot. in poultry or fish. Similarly, the advertisements by Purac, Inc. (Purac) to which ConAgra refers teach nothing about the use of sodium lactate to inhibit the growth of C. bot.
 
 
 32
 Dr. Diebel, OMFC's witness, testified that aerobic bacteria such as those discussed in Fukui and the article by Angersbach differ markedly from C. bot. Given these shortcomings of the prior art, the jury's findings implicit in its conclusion regarding obviousness are supported by substantial evidence. The trial court therefore properly denied ConAgra's renewal of its motion for JMOL on this issue. Likewise, the trial court did not abuse its discretion in denying ConAgra's motion for a new trial.
 
 Infringement
 
 33
 ConAgra argues that the trial court mistakenly excluded evidence concerning the use of a second salt in the claimed process and that the trial court erred in charging the jury that the use of sodium chloride would not affect the basic and novel characteristics of the claimed invention. The determination of infringement is a two-step analysis. Electro Medical Sys., S.A. v. Cooper Life Sciences, 34 F.3d 1048, 1053, 32 USPQ2d 1017, 1020 (Fed.Cir.1994). First, the patent claims must be properly interpreted without reference to the accused process. Id. This step poses a question of law which we review de novo. Id. Next, the accused process must be compared to the properly interpreted claims. Id. This second step poses a question of fact, which on a jury verdict we review under the substantial evidence standard. Id. The process claim of the '729 patent employed the transitional phrase "consisting essentially of." This phrase denotes a partially closed claim. A process which includes additional features that are not limitations of a partially closed claim will infringe that claim unless the additional features materially affect the basic and novel characteristics of the claimed process. Atlas Powder Co. v. E.I. Du Pont De Nemours & Co., 750 F.2d 1569, 1573-74, 224 USPQ 409, 412 (Fed.Cir.1984); In re Herz, 537 F.2d 549, 551-52, 190 USPQ 461, 463 (CCPA 1976).
 
 
 34
 ConAgra argued at trial that OMFC had amended its claim to recite a partially closed transition phrase in order to overcome a prior art rejection which included the use of a second salt. ConAgra further contends that OMFC is thereby estopped from now arguing that its claim reads on processes that include a second salt. The question presented is whether the accused process literally infringes the claim. Because the issue is literal infringement, not the doctrine of equivalents, the doctrine of prosecution history estoppel is inapplicable. Black & Decker, Inc. v. Hoover Service Center, 886 F.2d 1285, 1295, 12 USPQ2d 1250, 1259 (Fed.Cir.1989).
 
 
 35
 Nonetheless, the prosecution history may be used as an aid in interpreting the claims. Zenith Lab. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1421, 30 USPQ2d 1285, 1288 (Fed.Cir.), cert. denied, 63 U.S.L.W. 3370 (U.S.1994). The trial court, however, concluded that the use of the partially closed transition language was not intended to exclude all processes which use a second salt. That conclusion was not in error. During prosecution, OMFC distinguished the prior art two-salt process from the claimed subject matter on the grounds that all the prior art processes reduced the moisture content and the pH of the food. Thus, OMFC used a partially closed transitional phrase to exclude processes which reduce moisture and lower the pH of the foodstuff, not to exclude processes which use a second salt.
 
 
 36
 OMFC contends that ConAgra is judicially estopped from arguing that the interpretation of this claim of the '729 patent raises a question of fact, because (1) ConAgra had previously argued that the claim could be interpreted as a matter of law and (2) the trial court did indeed interpret the claim as a matter of law. Judicial estoppel is a procedural matter, reviewed under the law of the regional circuit in which the trial court sits. Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 665 & n. 4, 7 USPQ2d 1097, 1101 & n. 4 (Fed.Cir.), cert. denied, 488 U.S. 968 (1988). Judicial estoppel in the Seventh Circuit has two elements: (1) that the party has previously taken a position that the court has adopted and (2) that the party is now asserting an inconsistent position. In re Cassidy, 892 F.2d 637, 641 (7th Cir.), cert. denied, 498 U.S. 812 (1990). More particularly with respect to the first element, this court has previously noted that the party against whom estoppel is being asserted must have received some benefit from its previous position, i.e., it "won." Water, 850 F.2d at 665, 7 USPQ2d at 1101. Judicial estoppel does not apply here because the trial court rejected the claim interpretation ConAgra advanced. A party will often argue that facts material to a particular legal theory are not genuinely disputed. If the court rejects that theory, as it did here, the same party is free to argue that the facts material to a different legal theory are genuinely disputed. Because ConAgra did not prevail regarding claim interpretation, it is not estopped from arguing that genuine issues of fact exist.
 
 
 37
 Nonetheless, the trial court concluded, and we agree, that the basic and novel characteristic of this invention is the use of lactate salt to inhibit the growth of C. bot. Any additional step which does not interfere with the use of the lactate salt to inhibit the growth of C. bot. does not materially affect the basic and novel characteristics of the claimed invention and does not escape infringement. ConAgra's evidence did not suggest that the addition of a second salt interfered with the use of a lactate salt to suppress the growth of C. bot. Therefore, there was no factual issue to submit to the jury. The trial court committed no prejudicial legal error in its instructions to the jury regarding infringement. Substantial evidence supported the jury's verdict, and the trial court did not abuse its discretion in refusing to grant a new trial.
 
 Damages
 
 38
 OMFC licensed Purac under the patents. OMFC reserved the right to practice the invention itself, but agreed not to license anyone else. Purac agreed to sublicense all who made reasonable offers. OMFC received a fixed royalty on each sublicense. ConAgra argues that, by this agreement, OMFC has bargained away any right to exclude others, retaining only the right to collect a royalty. ConAgra further argues that by giving this license, OMFC established the measure of damages for infringement at the fixed royalty rate OMFC received from Purac's sublicensees.
 
 
 39
 One who chooses not to accept a license that is offered may not thereafter rely on the license royalty rate as the measure of damages. See Beatrice Foods Co. v. New England Printing & Lithographing Co., 899 F.2d 1171, 1173, 14 USPQ2d 1020, 1022 (Fed.Cir.1990). ConAgra here chose not to accept the license offered to it by Purac. ConAgra may not rely on that license now to limit OMFC's recovery. ConAgra was neither a party to the contract between Purac and OMFC nor an intended beneficiary thereof. In the contract, OMFC explicitly retained the right to pursue its full range of infringement remedies against anyone who did not obtain a sublicense. The allocation of rights between OMFC and Purac does not limit ConAgra's liability.
 
 
 40
 The methodology for the computation of damages lies within the discretion of the trial court. State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1576-77, 12 USPQ2d 1026, 1028 (Fed.Cir.1989), cert. denied, 493 U.S. 1022 (1990); King Instrument Corp. v. Otari Corp., 767 F.2d 853, 863, 226 USPQ 402, 409 (Fed.Cir.1985), cert. denied, 475 U.S. 1016 (1986). The amount awarded must be sufficient to compensate the patent owner for his loss, and may not be less than a reasonable royalty. 35 U.S.C. Sec. 284 (1988); State, 883 F.2d at 1577, 12 USPQ2d at 1028. Because OMFC retained the right to use the patented process, ConAgra's infringing activity was in direct competition with OMFC's sales. To the extent OMFC can satisfy the requirements for recovering lost profits, it is therefore entitled to recoup such damages. The trial court committed no prejudicial legal error in charging the jury that it could award lost profits despite the presence of the Purac license.
 
 
 41
 To recover lost profits, OMFC must prove that but for the infringement it would have made ConAgra's sales; however, OMFC need not eliminate all possibility that a purchaser would have bought a different product or forgone the purchase entirely. State, 883 F.2d at 1577, 12 USPQ2d at 1028. To satisfy this burden, it is sufficient to show four elements: (1) demand for products covered by the patent, (2) an absence of acceptable, noninfringing substitutes, (3) manufacturing ability and marketing capacity to exploit the demand, and (4) the amount of profits that would have been made. Id.; Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156, 197 USPQ 726, 730 (6th Cir.1978). Although this court has approved that approach, it is not the only way in which a plaintiff may prove lost profits. State, 883 F.2d at 1577, 12 USPQ2d at 1028.
 
 
 42
 With regard to the second Panduit element, this court has previously approved proof of market share as a substitute for proving the absence of acceptable, noninfringing alternatives. BIC Leisure Prods. v. Windsurfing Int'l, 1 F.3d 1214, 1219, 27 USPQ2d 1671, 1675 (Fed.Cir.1993); State, 883 F.2d at 1577-78, 12 USPQ2d at 1029. The trial court correctly charged the jury that in order to award lost profits it must find that but for the infringement the patent owner would have made its market share of the infringer's sales. With regard to acceptable, noninfringing alternatives, the court correctly charged that the plaintiff bears the burden of proving its market share by a preponderance of the evidence. ConAgra argues that in applying this instruction the jury was apt to ignore ConAgra's evidence that it could compete in this market without infringing the patent. We do not understand the instructions to invite such an interpretation. The trial court did not commit prejudicial legal error in charging the jury regarding lost profits. Substantial evidence supports the jury's finding of the appropriate market share, implicit in its award of damages. We will not disturb that finding.
 
 CONCLUSION
 
 43
 In conclusion, we find no error in the district court's judgment. The instructions concerning obviousness were not incorrect. The trial court did not err in excluding evidence concerning ConAgra's use of a second salt in its process. The license between Purac and OMFC does not affect ConAgra's liability for infringement in this suit. The court's instructions regarding lost profits as the measure of damages were not in error. Substantial evidence supported the jury verdict on each of these points, and the district court did not abuse its discretion when it refused to order a new trial. The judgment of the district court is therefore affirmed.